UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ELLYANA STANTON <br><br> Plaintiff <br><br> v. <br><br> AMC NETWORKS INC., <br> AMC STUDIOS, <br> STALWART PRODUCTIONS LLC, <br> AND COLIN WALSH, <br><br> Defendants | Civil Action No.: |

## COMPLAINT AND JURY CLAIM

1. Ellyana Stanton ("Stanton"), through counsel, respectfully submits this Complaint against AMC Networks Inc., AMC Studios, Stalwart Productions LLC (collectively, "AMC"), and Colin Walsh ("Walsh").

2. AMC employed Stanton as Set Medic for an AMC television production in which it employed Walsh as the producer in charge of day-to-day management. Walsh made disparaging sex-based comments about Stanton and her appearance leading to adverse employment action against her in violation of Title VII and M.G.L. c. 151B. Stanton's report of Walsh's disparaging sex-based comments led AMC to retaliate against her in violation of Title VII, and AMC and Walsh to retaliate against her in violation of M.G.L. c. 151B and M.G.L. c. 12, § 11I. After receiving Stanton's report about Walsh's misconduct, AMC and Walsh fabricated an allegation that Stanton violated COVID protocols at work, used this pretextual reason to justify adverse employment action against her, and then disseminated this allegation – particularly devastating insofar as she is a health care worker – in an effort to blacklist her from continuing to work in the entertainment production industry and in an attempt to discredit her and coerce her into silence. AMC and Walsh so harmed Stanton's reputation that it affected her ability to earn future employment in the entertainment production industry. AMC and Walsh thus also engaged in defamation, common law civil conspiracy, and civil conspiracy pursuant to 42 U.S.C. § 1985. AMC also committed breach of contract for ignoring and violating its Policy Prohibiting Harassment, Discrimination and Retaliation, to which it called Stanton's special attention and which it required her to sign as a condition of employment.

## PARTIES

3. Stanton is a Jewish woman residing in Massachusetts.

4. AMC employed Stanton from October 1, 2020, through March 12, 2021, as the Set Medic during filming in eastern Massachusetts of the first season of a television show it owns, *Kevin Can F\*\*k Himself* ("Show").

1

5.     AMC Networks Inc. is a Delaware corporation and an entertainment company with a business address of 11 Penn Plaza, New York, NY 10001.

6.     AMC Networks Inc. self-describes AMC Studios as "the in-house studio, production and distribution operation for AMC Networks Inc." *See* https://www.amcnetworks.com/amc-studios/ (accessed August 17, 2022).

7.     Stalwart Productions LLC is a Delaware limited liability company and it is the exclusive production company for AMC Studios. Stalwart Productions LLC was the production company for filming the first season of the Show. Stalwart Productions LLC has a business address of 11 Penn Plaza, New York, NY 10001.

8.     Walsh is an individual AMC employed as a producer for the filming of the first season of the Show. Walsh had responsibility for day-to-day management of the Show's crew. Walsh frequently was the highest-ranking person on set during filming of the Show's first season.

9.     AMC employed both Walsh and Stanton during filming of the first season of the Show and Walsh had immediate or successively higher authority over Stanton

## JURISDICTION

10.    Jurisdiction is proper under 28 U.S.C. § 1331, 28 U.S.C. § 1343, and 28 U.S.C. § 1367.

11.    Venue is proper pursuant to 28 U.S.C. § 1391(b). A substantial part of the events giving rise to Stanton's claims occurred in Massachusetts.

12.    On or about November 22, 2021, Stanton filed charges with the Massachusetts Commission Against Discrimination ("MCAD") and the Equal Employment Opportunity Commission ("EEOC"). At Stanton's request so that she could file suit in this Court, the MCAD dismissed Stanton's charge on February 24, 2022, and the EEOC did so on May 25, 2022. Stanton has filed timely within the ninety day EEOC deadline to do so.

## FACTS

13.    Between 2011-2017, Stanton worked as an Emergency Medical Technician and Emergency Room Technician before she became a television and film production medic.

14.    Prior to working on the Show, Stanton served as a medic on eighteen television and film productions including for Disney, HBO, Warner Bros., and Twentieth Century Fox Film Corp.

15.    Excluding AMC's and Walsh's fabricated allegation that she violated COVID protocols, to her knowledge Stanton has never had a work-related complaint lodged against her, performance-based or otherwise.

16.    Stanton's personnel record at AMC contains no documentation of any complaints against her, nor any negative comments about her, nor any disciplinary action of any kind, nor any violation by her of any protocol including but not limited to COVID protocols.

17.    According to a contract between Stanton and Stalwart Productions LLC dated September 28, 2020, "Employee agrees that Employee has received and will abide by the Producer's safety guidelines as well as 'Producer's Anti-Piracy and Production Security Policy' and its 'Policy Prohibiting Harassment, Discrimination and Retaliation'." That anti-discrimination and anti-retaliation policy is at Exhibit A and Stanton signed it as required in order for her to be employed.

18. Stanton left approximately two weeks before the end of filming due to her grandmother's death in Israel. Stanton timely notified the Unit Production Manager about the situation and found a qualified union medic who assumed her duties for the remainder of filming. Stanton's only direct substantive communication with Walsh came when she informed him that she had found coverage for her duties for the remainder of filming.

19. In August 2021, AMC renewed the Show for a second season. Stanton expected to continue serving as the Set Medic during filming which would again take place in Massachusetts. Based on filming season one of the Show, Stanton expected filming for season two would take approximately 5.5 months and that she would earn approximately $77-78,000 during that time because, pursuant to the relevant union contract, she would have received a raise resulting in average pay of roughly $3,525.00 per week.

20. On October 3, 2021, Stanton sent Walsh an email which read in relevant part:

> Hello Colin, I was so thrilled to hear confirmation of a season 2 for Kevin. I had a great time taking care of the Cast & Crew for Season 1. I'm currently working on Hocus Pocus 2 with Jill Taylor, and we were just saying how great it was to work together as a team on Season 1 of Kevin, with her covering Construction and I covering Set. While I know we're a few months away from the start of filming. I just wanted to express my interest and hope to return for Season 2 as your Set Medic. I've attached my most updated resume for reference.

21. Walsh did not respond to Stanton's email dated October 3, 2021.

22. On October 4, 2021, Stanton started working on Disney Studio's Hocus Pocus 2, where she served as Medic for Construction, Stunts, and Set. Stanton understood that filming of Hocus Pocus 2 would end before filming for the second season of the Show began.

23. On October 4, 2021, on set, Stanton saw Mark Meagher ("Meagher"), who served as the Health Safety Supervisor for filming season one of the Show. Health Safety Supervisor is a role created because of the COVID pandemic and this person oversees and ensures compliance with COVID protocols during a production.

24. Meagher informed Stanton that he did not think she would be working on set for filming season two of the Show. Meagher also informed Stanton that, despite his specific request for her return, he had learned that Walsh not only did not want her to return but that he would not recommend her for any other production.

25. Stanton learned that Walsh had told multiple people that he did not like the way she dressed, did not like the way her body looked, and that he thought she looked and dressed "slutty." This last comment is especially odd insofar as Stanton typically dressed in jeans or dress pants along with appropriate winter attire because much of the filming for the Show took place outside.

26. On October 8, 2021, Stanton called Kelly Kreiser ("Kreiser"), the Health Safety Coordinator for filming season one of the Show, who confirmed that Walsh had frequently made highly inappropriate comments about Stanton's clothing and body.

27. After this conversation, Kreiser sent Stanton a text message on October 8, 2021, "Please don't mention my name about anything. Please don't involve me at all. I'm so sorry, I can't help you. I need to not be involved at all."

28. Walsh is a very prominent figure in the entertainment industry with immense power to retaliate against someone. Kreiser was terrified of being involved in this situation for fear that Walsh would retaliate against her.

29. On the evening of October 8, 2021, Stanton called Walsh and left a voice mail in which she expressed hope that she would continue working on season two but had heard some claims that he had made comments about her appearance and wanted to hear his side of the story.

30. Walsh did not return Stanton's call of October 8, 2021.

31. On October 11 or 12, 2021, an AMC human relations officer, Alexandra Monaco ("Monaco"), called Stanton. Stanton told Monaco that she was at that moment drafting a written complaint to AMC about Walsh's behavior but that she would agree to make her report in that telephone call. Monaco told Stanton she would investigate and she assured Stanton of AMC's "zero tolerance" for discrimination of any sort.

32. AMC conducted a sham investigation and did not even contact some witnesses.

33. On or about October 13, 2021, Stanton again spoke with Monaco who stated that Walsh denied saying anything about the way she dressed but admitted to talking to other people about her shoes. Recognizing the implausibility of Walsh's statement, Stanton responded that she and Monaco both knew Walsh was not talking to people about only her shoes. Monaco informed Stanton that she had warned Walsh that it is inappropriate to talk to other people about a colleague's physical appearance and also had made AMC executives aware of Stanton's complaint.

34. Nearly a month later, on November 9, 2021, Stanton again spoke to Monaco on the telephone and learned she would not be employed for filming season two of the Show.

35. Monaco indicated in the telephone call on November 9, 2021, that Walsh conceded that he made comments about Stanton's shoes. Monaco then revealed for the very first time an allegation against Stanton: that she failed to abide by COVID protocols and for that reason she would not be employed for filming season two of the Show. Stanton had not learned of this COVID protocol allegation until the telephone call with Monaco on November 9, 2021.

36. On November 10, 2021, Stanton received a confirmatory email from Monaco:

> In response to your complaint against Colin Walsh, we contacted individuals that you indicated would be able to attest to your claim that Colin made inappropriate and discriminatory comments about your appearance. The individuals that were willing to speak with us did not substantiate your claims, however as I shared with you, Colin conceded that he did make a comment about your footwear once or twice. While there was no guarantee of employment for Season 2, based on our inquiry the decision to not hire you was based on your failure to abide by COVID protocols, particularly in light of your role as set medic.

37. This allegation by Walsh and AMC that Stanton did not abide by COVID protocols is false and retaliatory in nature. Moreover, the allegation is designed to provide pretextual justification for not employing Stanton for season two. Walsh and AMC are using the COVID-based allegation to shield themselves from liability for wrongful and illegal actions.

38. Monaco's email admits the impact of the COVID-based allegation in light of Stanton's job ("particularly in light of your role as set medic").

39.     In its Position Statement to the MCAD, AMC claimed that Stanton violated COVID protocols on February 9, 10, and 11, 2021.

40.     The relevant COVID protocols are at Exhibit B and read, in relevant part, "We will be enforcing social distancing. Please remember to stay more than 6 feet apart whenever possible," and "Everyone should maintain physical distance of at least 6 feet unless this is not practicable for their specific job or duty." The COVID protocols thus acknowledged the need for some level of flexibility within an aspirational goal of maintaining six feet of distance between people. The COVID protocols did not make reference to any adverse employment action in the event someone violated them.

41.     Stanton admits to multiple under-six-foot contacts with people on February 9, 2021, but for work-related reasons: she set up where her superiors directed her to do so during filming in a small indoor location. Filming sometimes occurred in confined spaces where it was impossible for people to stay six feet apart (as the protocols at Exhibit B acknowledge). On February 9, 2021, filming took place in just such a location. In fact, on this date, the filming production exceeded the venue's maximum legal capacity even without social distancing strictures. By order of her superiors, Stanton, along with crew members from at least four other departments, were packed into a small kitchen space along with their equipment.

42.     Stanton does not control her location during filming, her superiors do: they direct her as to where they want her to stand ready to assist if needed.

43.     Notably, except for Stanton, every crew member who filled that small kitchen space on February 9, 2021, returned to the Show's production for season two.

44.     On February 10, 2021, Stanton likewise admits to having multiple under-six-foot contacts but these were all related to her treatment of a patient who suffered a head injury. This situation required extensive close contact not only so that Stanton could treat the injury and follow concussion protocol but also so that she could ask personal questions related to completing extensive paperwork.

45.     Finally, on February 11, 2021, Stanton was sitting and eating in a designated area for the purpose when someone approached her to ask a work-related medical question. If anyone violated COVID protocols in this instance, arguably it was the person who approached her.

46.     AMC also alleged in its Position Statement that Stanton removed her protective safety goggles at unspecified times. AMC omits that Stanton sometimes had to do so in the course of treating a patient so that her vision was not impaired. AMC does not describe a single instance where Stanton removed her goggles inappropriately.

47.     In reality, Stanton meticulously followed COVID protocols for her own safety, along with that of her colleagues, but she could not treat patients while maintaining a six-foot distance. Additionally, there were times when superiors ordered Stanton to set up in a location that put her within a six-foot proximity to other people.

48.     Stanton has plenty of photographs and video recordings showing people on set of filming season one of the Show without goggles, within six feet of each other, and committing COVID protocol violations. Stanton respectfully suggests that none of these people ever were disciplined by AMC nor were her superiors who ordered her to set up within six feet of other co-workers. Nearly all of these people returned to work filming season two of the Show.

49.     AlertTrace records exist for filming season one of the Show. These AlertTrace records will reveal myriad instances of AMC personnel within six feet of each other, including but not limited to Walsh, and these individuals returned to work on filming season two of the Show. On information and belief, AlertTrace records exist for filming season two of the Show as well.

50.     Due to the medical nature of Stanton's profession, Walsh's and AMC's defamatory statements were made not only to retaliate against her for complaining about Walsh and his comments about her appearance and dress but also to cripple her career, discredit her, and coerce her from taking legal action.

51.     On information and belief, AMC and Walsh actively are blacklisting Stanton and have told third parties that she violated COVID protocols.

52.     AMC and Walsh are blacklisting Stanton with great effect: prior to her complaint about Walsh, Stanton has never been turned down for any filming job to which she applied but since her complaint about him, she has been rejected from multiple productions in addition to her exclusion from the production of season two of the Show.

53.     One production that rejected Stanton hired instead a medic who had a total of six weeks of experience and had not yet even been admitted to the relevant union (IATSE), in contrast to Stanton's years of experience as an industry medic, her prior hospital experience, and her union membership.

54.     Walsh's and AMC's fabricated allegation has, and will continue to have, a long-term and devastating effect on Stanton's reputation and ability to obtain employment in her industry.

## COUNT I
## Hostile Work Environment in Violation of Title VII (Against AMC Networks Inc., AMC Studios, and Stalwart Productions LLC)

55.     Stanton repeats and realleges the allegations contained in all preceding paragraphs above.

56.     In violation of Title VII of the Civil Rights Act of 1964, Stanton was the target of Walsh's offensive sex-based slurs and sex-based discrimination, particularly about her body, her appearance, and her clothing and shoes, which then led AMC to take adverse employment action against her.

57.     AMC Networks Inc., AMC Studios, and Stalwart Productions LLC did not adequately supervise Walsh, review Walsh's activities, investigate when they knew or should have known about Walsh's misconduct, take necessary measures as to complaints made about Walsh by Stanton, and failed to act adequately when they knew or should have known about Walsh's misconduct.

58.     Stanton has suffered damages directly and proximately caused by the above-referenced violations by AMC Networks Inc., AMC Studios, and Stalwart Productions LLC, including but not limited to emotional distress, as well as attorney's fees and court costs and she seeks recovery with interest thereon as available at law.

59.     WHEREFORE, Stanton hereby demands judgment by this Court against AMC Networks Inc., AMC Studios, and Stalwart Productions LLC in an amount which is adequate to compensate her for her damages together with interest, costs, and attorney's fees.

## COUNT II
### Violation of M.G.L. c. 151B (Against All Defendants)

60.     Stanton repeats and realleges the allegations contained in all preceding paragraphs above.

61.     In violation of M.G.L. c. 151B, Stanton was the target of Walsh's offensive sex-based slurs and sex-based discrimination, particularly about her body, her appearance, and her clothing and shoes, which then led AMC and Walsh to take adverse employment action against her.

62.     AMC Networks Inc., AMC Studios, Stalwart Productions LLC, and Walsh all interfered with the exercise by Stanton of her enjoyment of rights granted or protected by M.G.L. c. 151B.

63.     AMC Networks Inc., AMC Studios, Stalwart Productions LLC, and Walsh discharged, expelled or otherwise discriminated against Stanton because she opposed and complained about practices forbidden under M.G.L. 151B.

64.     AMC Networks Inc., AMC Studios, Stalwart Productions LLC, and Walsh violated M.G.L. c. 151B by retaliating against Stanton for opposing practices that violated M.G.L. c. 151B and for reporting them.

65.     AMC Networks Inc., AMC Studios, and Stalwart Productions LLC did not adequately supervise Walsh, review Walsh's activities, investigate when they knew or should have known about Walsh's misconduct, take necessary measures as to complaints made about Walsh by Stanton, and failed to act adequately when they knew or should have known about Walsh's misconduct.

66.     Stanton has suffered damages directly and proximately caused by the above-referenced violations by AMC Networks Inc., AMC Studios, Stalwart Productions LLC, and Walsh, including but not limited to emotional distress, as well as attorney's fees and court costs and she seeks recovery with interest thereon as available at law.

67.     WHEREFORE, Stanton hereby demands judgment by this Court against AMC Networks Inc., AMC Studios, Stalwart Productions LLC, and Walsh in an amount which is adequate to compensate her for her damages together with interest, costs, and attorney's fees.

## COUNT III
### Retaliation (Against All Defendants)

68.     Stanton repeats and realleges the allegations contained in all preceding paragraphs above.

69.     Stanton engaged in activity protected under federal and Massachusetts law and AMC Networks Inc., AMC Studios, Stalwart Productions LLC, and Walsh each subjected her to adverse employment actions and retaliation because of this activity.

70.     AMC Networks Inc., AMC Studios, Stalwart Productions LLC, and Walsh retaliated against Stanton in violation of M.G.L. c. 151B.

71. AMC Networks Inc., AMC Studios, and Stalwart Productions LLC in addition retaliated against Stanton in violation of 42 U.S.C. 2000e-3(a).

72. 42 U.S.C. § 2000e-3(a) and M.G.L. c. 151B, §§ 4(4) and 4(4A) each create a cause of action separate from Stanton's underlying hostile work environment claims: retaliation for making a complaint regardless of its ultimate outcome or accuracy.

73. Stanton engaged in protected activity in making a good faith report about Walsh's misconduct and she suffered retaliation linked to that report. But for making that report, the Defendants' retaliatory acts would not have occurred.

74. Stanton had a spotless personnel record at AMC but after she made her report about Walsh's misconduct, and directly linked to that report, all the Defendants took adverse employment action against her in retaliation. In addition to not working on the production of season two of the Show, the Defendants manufactured baseless allegations that Stanton had violated COVID protocols and they disseminated those allegations so as to blacklist her in the industry, discredit her, coerce her, and further retaliate against her.

75. Stanton has suffered damages directly and proximately caused by the above-referenced violations by AMC Networks Inc., AMC Studios, Stalwart Productions LLC, and Walsh, including but not limited to emotional distress, as well as attorney's fees and court costs and she seeks recovery with interest thereon as available at law.

76. WHEREFORE, Stanton hereby demands judgment by this Court against AMC Networks Inc., AMC Studios, Stalwart Productions LLC, and Walsh in an amount which is adequate to compensate her for her damages together with interest, costs, and attorney's fees.

## COUNT IV
**Breach of Contract (Against AMC Networks Inc., AMC Studios, and Stalwart Productions LLC)**

77. Stanton repeats and realleges the allegations contained in all preceding paragraphs above.

78. AMC Networks Inc., AMC Studios, and Stalwart Productions LLC entered into contractual agreements with Stanton regarding the terms and conditions of her employment, including but not limited to the policy at Exhibit A prohibiting discrimination, harassment, and retaliation for making a good-faith complaint.

79. The policy at Exhibit A lists as contacts AMC Networks Inc.'s Senior Vice President for Human Resources and Stalwart Productions LLC's Director.

80. AMC Networks Inc., AMC Studios, and Stalwart Productions LLC called special attention to the policy at Exhibit A and required Stanton to sign it as a condition of being employed. Stanton did so.

81. Stanton relied on the policy at Exhibit A, including but not limited to the unequivocal provision prohibiting retaliation against employees making good-faith reports of misconduct.

82.     Stanton reasonably believed that AMC Networks Inc., AMC Studios, and Stalwart Productions LLC employed her on the terms stated in the policy at Exhibit A and she had a reasonable expectancy that they would adhere to all of these policy provisions.

83.     AMC Networks Inc., AMC Studios, and Stalwart Productions LLC breached their agreements with Stanton regarding her employment, including but not limited to the policy at Exhibit A.

84.     Stanton has suffered damages directly and proximately caused by the breaches by AMC Networks Inc., AMC Studios, and Stalwart Productions LLC as well as attorney's fees and court costs and she seeks recovery with interest thereon as available at law.

85.     WHEREFORE, Stanton hereby demands judgment by this Court against AMC Networks Inc., AMC Studios, and Stalwart Productions LLC in an amount which is adequate to compensate her for her damages together with interest, costs, and attorney's fees.

## COUNT V
### Violation of M.G.L. c. 12, § 11I (Against All Defendants)

86.     Stanton repeats and realleges the allegations contained in all preceding paragraphs above.

87.     AMC Networks Inc., AMC Studios, Stalwart Productions LLC, and Walsh interfered by threats, intimidation or coercion, or attempted to interfere by threats, intimidation or coercion, with the exercise or enjoyment by Stanton of rights secured by federal and state law.

88.     These threats, intimidation, or coercion include, but are not limited to, use of defamatory allegations of COVID protocol violations to leverage Stanton, affect her job prospects to her detriment, and thus coerce her economically.

89.     These threats, intimidation, or coercion interfered with Stanton's due process and property rights related to the investigation into her allegations against Walsh and her right to be free from retaliation.

90.     Stanton has suffered damages directly and proximately caused by the above-referenced violations by AMC Networks Inc., AMC Studios, Stalwart Productions LLC, and Walsh, including but not limited to emotional distress, as well as attorney's fees and court costs and she seeks recovery with interest thereon as available at law.

91.     WHEREFORE, Stanton hereby demands judgment by this Court against AMC Networks Inc., AMC Studios, Stalwart Productions LLC, and Walsh in an amount which is adequate to compensate her for her damages together with interest, costs, and attorney's fees.

## COUNT VI
### Defamation (Against All Defendants)

92.     Stanton repeats and realleges the allegations contained in all preceding paragraphs above.

93.     The Defendants communicated false statements of fact amongst themselves and to third parties

regarding Stanton, including but not limited to allegations that she violated COVID protocols during filing of the Show.

94. The Defendants' false statements were capable of damaging Stanton's reputation in the community and prejudicing her in her profession and business and they did so, causing her harm.

95. The Defendants knew or should have known that the above-referenced false statements were false.

96. Stanton has suffered damages directly and proximately caused by the above-referenced violations by AMC Networks Inc., AMC Studios, Stalwart Productions LLC, and Walsh, including but not limited to emotional distress, as well as attorney's fees and court costs and she seeks recovery with interest thereon as available at law.

97. WHEREFORE, Stanton hereby demands judgment by this Court against AMC Networks Inc., AMC Studios, Stalwart Productions LLC, and Walsh in an amount which is adequate to compensate her for her damages together with interest, costs, and attorney's fees.

## COUNT VII
### Conspiracy (Against All Defendants)

98. Stanton repeats and realleges the allegations contained in all preceding paragraphs above.

99. Defendants are parties to conspiracy, including but not limited to common law conspiracy and conspiracy in violation of 42 U.S.C. § 1985.

100. Each of the Defendants has, to varying degrees, participated in planning and carrying out the objectives of the conspiracy and all are liable for the concerted actions of their co-conspirators.

101. The objects of the conspiracy have including depriving Stanton of her protected rights, privileges, immunities, and property; intimidating and retaliating against her because of the complaints she made about Walsh's misconduct; and benefiting the Defendants by discrediting Stanton and affecting her ability to seek employment in her industry to her detriment.

102. Stanton has suffered damages directly and proximately caused by the above-referenced violations by AMC Networks Inc., AMC Studios, Stalwart Productions LLC, and Walsh, as well as attorney's fees and court costs and she seeks recovery with interest thereon as available at law.

103. WHEREFORE, Stanton hereby demands judgment by this Court against AMC Networks Inc., AMC Studios, Stalwart Productions LLC, and Walsh in an amount which is adequate to compensate her for her damages together with interest, costs, and attorney's fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

1. Award appropriate compensatory damages, including multiple, consequential, and punitive damages, in an amount determined at trial, exclusive of interest, in an amount in excess of $1,750,000;

2. Order appropriate declaratory relief regarding the unlawful acts and practices of Defendants;

3. Order appropriate equitable relief against Defendants, including the enjoining and permanent restraining of violations and defamation of Stanton, and direction to Defendants to take such affirmative action as is necessary to ensure that the effects of their unlawful practices are eliminated and do not continue to affect Stanton's employment opportunities;

4. Award attorney's fees, costs, and disbursements of this action pursuant to M.G.L. c. 12 §11I, M.G.L. c. 151B, and Title VII, and as otherwise provided by law; and,

5. Order such further relief, including orders and award, as the Court may deem just and proper.

## JURY DEMAND

Stanton requests a jury trial.

Respectfully submitted,

ELLYANA STANTON,

By her attorney,

/s/ Christian G. Samito
Christian G. Samito, Ph.D.
BBO# 639825
Samito Law, LLC
15 Broad Street, Suite 800
Boston, MA 02109
(617) 523-0144 (telephone)
Christian@samitolaw.com
www.samitolaw.com

Date: August 19, 2022